Ginter Coal Company, et al. *v.* Environmental Hearing Board and Department of Environmental Resources, Intervenor.

Argued May 7, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Norman M. Yoffe,* for appellants.

No appearance for appellee.

*K. W. James Rochow,* Assistant Attorney General, for intervenor.

Opinion by Judge Kramer, June 18, 1973:

This is an appeal by the Ginter Coal Company and Timothy Reilly (hereinafter referred to as Ginter) from an order of the Environmental Hearing Board (Board) denying an appeal from a September 19, 1972 order of the Department of Environmental Resources, Bureau of Land Protection and Reclamation (DER), directing Ginter to apply for a license under the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P. L. 1198, as amended, 52 P.S. §1396.2 et seq. (hereinafter referred to as SMCR Act). DER's order also contained a "Stop Order" directing Ginter to cease all its operations until it secured "the necessary license, liability insurance and permit."

The sole question presented to this Court is whether Ginter's business operations of removing anthracite coal from culm banks is "surface mining" within the meaning of the SMCR Act. The pertinent facts are not in dispute. Ginter is in the business of recovering anthracite coal from culm banks located on leased property in Schuylkill County. The two culm banks cover about 20 acres each, one approximately 30 feet high, the other approximately 50 feet high. These culm banks consist of deposits of fine particles of coal, rock and other material, representing the residue or waste from coal mining operations many years ago. The culm banks in question are about 25 years old. Ginter commenced its operations approximately eight years ago. Ginter digs into the culm bank with tractor-type, front end loaders which pick up a load of the material, which is then transported between 100 and 500 feet into a processing plant where the coal is separated from the rocks and other debris. The coal is then deposited in railroad hopper cars at the plant site and sent to Ginter's customers. The record shows that Ginter, through its process, realizes from the material about 60 per cent coal

and 40 percent residue. Ginter uses water from an unnamed stream nearby, which is pumped into the processing plant, mixed with the residue, and pumped in the form of a slurry to a silt dam where it is deposited. The silt dam is constructed of refuse consisting of slate, rock and some coal. The silt dam is in a location adjacent to the culm banks.

One of the more interesting aspects of the record in this case is that although there is disagreement on whether Ginter's water operation further pollutes the streams in the locality, there is general agreement, even by DER, that the long-range effect of Ginter's operation will be to reduce pollution by virtue of the eventual removal of the culm banks, and thereby benefit the environment in the Commonwealth.

In any event, as the issue was presented to this Court, we are not called upon at this time to make a determination on whether Ginter's operation violates any of the pollution laws or standards. Rather, we are called upon solely to determine whether Ginter's operation is surface mining within the legislative intent of the SMCR Act. This is a case of first impression in that there have been no prior cases brought to the courts requiring a determination of the meaning of "surface mining."

The definition of surface mining is found in Section 3 of the SMCR Act, 52 P.S. §1396.3, wherein it is stated: " 'Surface mining' shall mean the extraction of minerals from the earth or from waste or stock piles or from pits or banks by removing the strata or material which overlies or is above or between them or otherwise exposing and retrieving them from the surface, including but not limited to strip, drift, and auger mining, dredging, quarrying, and leaching, and activities related thereto, but not including those mining operations carried out beneath the surface by means of

shafts, tunnels, or other underground mine openings." In that same section, we find the definition of minerals: " 'Minerals' shall mean any aggregate or mass of mineral matter, whether or not coherent, which is extracted by surface mining, and shall include but not be limited to limestone and dolomite, sand and gravel, rock and stone, earth, fill, *slag,* iron ore, zinc ore, vermiculite, clay, and anthracite and bituminous coal." (Emphasis added.)

Other sections of the SMCR Act provide that, if Ginter is engaged in surface mining, it first must obtain a license (52 P.S. §1396.3(a)), and before commencing to operate, it is required to obtain a permit (52 P.S. §1396.4) and file certain securities and plans with DER.

Ginter contends that the statutory definition of "surface mining" does not apply to its operation for the reason that it is not extracting minerals from the surface. Ginter also argues that the material in the culm bank is personalty, as distinguishable from realty, and that the Legislature failed to use the word "spoil pile" in the definition of "surface mining" while giving "spoil pile" its own separate definition. There is no merit to Ginter's contentions.

Our reading of the record in this case, together with the legislative definition, leads us to conclude that Ginter is extracting minerals from a waste pile by removing the material which is above the surface and thereby exposing the surface, or the remaining portions of the culm bank, after each shovel removal. We find support for our conclusion in the definition of "minerals," which includes the term "slag." Although the definition of the term "slag" may also include lava (which is a natural deposit by eruption), slag in this statute obviously means the residue stacked or piled as

a result of industrial metal processing operations. Since the Legislature included "slag" within the definition of minerals, a fortiori, processing operations such as Ginter's in this case were contemplated by the Legislature to be included within the term "surface mining."

Ginter's operation is not like a stock pile of 100 per cent coal often seen at an electric generating plant. Ginter's operation consists of digging into the culm banks to obtain material consisting of many elements necessitating processing so as to extract the desired mineral, i.e., anthracite coal, from the total material removed.

We recognize that our Supreme Court in *Gilberton Coal Company v. Schuster*, 403 Pa. 226, 229, 169 A. 2d 44, 45 (1961), a case involving a coal culm bank, stated that: "Culm, or refuse, incident to mining which is removed from its original place and piled on the surface of the land is personal property. . . ." From our reading of the SMCR Act, it is not really relevant whether Ginter's culm banks are personalty or realty. What is relevant is whether Ginter is surface mining into the culm banks within the statutory definition. We have concluded that Ginter is surface mining.

Ginter's argument on "spoil pile" is not applicable. Section 3 of the SMCR Act, 52 P.S. §1396.3, defines this term as: " 'Spoil pile' shall mean the overburden and reject minerals as piled or deposited in surface mining." The record in this case discloses that the Ginter culm banks were deposited from many years of deep mining, and therefore, under the legislative definition, could not be deemed to be spoil piles.

Remembering the long range beneficial effect, one may question the advisability of deterring surface miners such as Ginter from improving the environment by

the removal of pollution, and one even could argue that operations such as Ginter's should be encouraged, the fact remains that it is the legislative direction and intention which controls. Our duty is to carry out that legislative intent. We therefore affirm the order dated November 29, 1972 of the Environmental Hearing Board.

We note in closing that at argument a question was raised concerning a possible inconsistency between Finding of Fact No. 16 and Conclusion of Law No. 3. That finding reads: "In removing the material from the bank, the surface of the earth underneath is generally *not disturbed* and the natural stratum and soil is re-exposed." (Emphasis added.) Conclusion of Law No. 3 reads in pertinent part: "The purpose of the Surface Mining Conservation and Reclamation Act is to insure that in any operation where the surface of the earth *is disturbed*, whether such surface was artificially or naturally deposited, that such operation be conducted in a way which would prevent air and water pollution and ultimately result in the reclamation of the affected area to enable it to sustain plant life and/or be usable for other purposes." (Emphasis added.) A very careful reading of these two provisions of the adjudication, however, permits us to conclude that the Board was not inconsistent. As we read the Act, the earth itself need not be disturbed or exposed so long as materials are removed from waste or stock piles. Whether they are removed from the surface of the piles or from the earth itself is of no consequence. Therefore we affirm the order of the Board.